# United States District Court
# District of Massachusetts

MARY KELLY,
      Plaintiff,

     v.                     CIVIL ACTION  NO. 2006-12291-MLW

CORT FURNITURE,
      Defendant.

## REPORT AND RECOMMENDATION ON DEFENDANT CORT FURNITURE RENTAL'S MOTION FOR SUMMARY JUDGMENT (#29)

COLLINGS, U.S.M.J.

### I. Introduction

In mid-October, 2006, plaintiff Mary Kelly filed a civil action against defendant CORT Furniture (hereinafter "CORT") in the Norfolk Superior Court in the Commonwealth of Massachusetts.  Approximately two months later CORT removed the case to the United States District Court for the District of Massachusetts and filed an answer to the complaint.  After issue was joined,

discovery was undertaken in the normal course and, in accordance with an April 2008 Scheduling Order, on July 14, 2008, the defendant filed a motion for summary judgment together with a memorandum in support with exhibits and a statement of material facts.  The plaintiff filed her opposition to the dispositive motion on August 13, 2008, along with an affidavit and a statement of material facts.  CORT's reply was submitted on September 8, 2008, and at this juncture the record on the summary judgment motion is complete.[1]

## II. The Facts

Mary Kelly was hired by CORT in March of 2002 to work as a bookkeeper at the defendant's distribution center in Norwood, Massachusetts. (Defendant CORT Furniture Rental's Statement of Undisputed Material Facts #31 ¶9; Response to CORT Furniture Rental's Statement of Undisputed Material Facts #37 ¶9[2]) At the time she was hired the plaintiff was provided with a document entitled "Invitation to Employees" wherein CORT explained that, as a government contractor, it was required "to take affirmative action to employ

---

[1]

This dispositive motion has been referred to the undersigned for the issuance of a report and recommendation as to disposition pursuant to 28 U.S.C. §636(b). (#32)

[2]

Unless otherwise noted, reference shall be made to the defendant's Statement of Undisputed Material Facts and the plaintiff's Response thereto rather than the evidentiary materials supporting the facts.

and advance in employment qualified individuals with disabilities" and requested that if she had "such a disability and would like to be considered under the Affirmative Action Programs, please tell us." (#31 ¶10, Exh. B, Depo. Exh. 15; #37 ¶10)  In response to the Invitation, the plaintiff checked the "No" box, indicating that she was not qualified and would not like to benefit under Affirmative Action. (#31 ¶10, Exh. B, Depo. Exh. 15; #37 ¶10)

Teresa Udden became the plaintiff's supervisor in or about November, 2003. (#31 ¶¶8, 9; #37 ¶¶8, 9)  In 2003, Ms. Kelly advised Ms. Udden that she was experiencing problems with her back. (#31 ¶11; #36 ¶3 and Exh. B; #37 ¶11)  In November of 2003 the plaintiff received a pay raise from CORT and was promoted to the position of Project Coordinator.[3] (#31 ¶11; #37 ¶11)  Ms. Kelly received another pay raise in November, 2004. (#31 ¶11; #37 ¶11)

At her deposition the plaintiff testified that while her back problems limited her ability to lift and deliver certain items such as a chair or a couch, her ability to perform everyday activities such as walking, getting up and down stairs, sitting, standing up, answering and talking on the telephone, typing,

---

[3]

The function of the Project Coordinators is to support CORT's sales staff; they "serve as customer contacts for large accounts, receive and input customer orders, and coordinate furniture deliveries and pick-ups." (#31 ¶4; #37 ¶4)

and filing paperwork were not impacted.  (#31 ¶12, Exh. B at 292, 300-301[4])

Ms. Kelly did not recall her doctor ever putting her on any written job

restrictions consequent to her back ailments during the time she was employed

at CORT. (#31 ¶12, Exh. B at 311)  While at CORT, the only occasion on which

Ms. Kelly requested an accommodation for her back problems was during the

annual cleaning when leases were boxed up and put into storage. (#31 ¶12,

Exh. B at 312-313[5])  The plaintiff requested help from the warehouse manager,

and someone from the warehouse did the lifting and moving for her. (#31 ¶12,

Exh. B at 312)

In its Employee Handbook, CORT sets forth its policy with respect to

excessive unscheduled absence and tardiness as follows:

> Because excessive unscheduled absence and tardiness
> disrupt work flow and customer service, all employees
> should understand the importance of being on time for

---

[4]

Ms. Kelly qualified this deposition testimony in her affidavit, stating that she "could not sit for extended periods at work...[so she] needed to stand for considerable periods." (Affidavit of Mary Kelly #36 ¶19)

[5]

Ms. Kelly states that she had procedures done on her back from which it took two days to recover. She requested of CORT that she be allowed to take certain Fridays off to undergo these treatments, and CORT "accommodated this request." (#36 ¶3)

> work and reporting as scheduled. Excessive
> unscheduled absences or tardiness will result in
> disciplinary action, up to and including termination.

#31 ¶6, Exh. B, Depo. Exh. 28; #37 ¶6.

At her deposition the plaintiff agreed that it was an essential function of her job

as a Project Coordinator to be reliable, "to be punctual, meaning on time and

ready to work," "to have regular and predictable attendance" at work, to let co-

workers and managers know her whereabouts during the workday, and to keep

in touch with her supervisor during the workday. (#31 ¶5, Exh. B at 155-156;

#37 ¶5[6]) She also agreed that failure to report to work in a timely fashion or

to adhere to a regular work schedule could be detrimental to CORT's business

in that customer calls would not be answered timely or orders would be left

unfilled. (#37, Exh. B at 138-139, 173)

According to Ms. Udden, while she was employed by CORT the plaintiff

"displayed a pattern of chronic absenteeism and tardiness." (#31 ¶14, Exh. A,

Affidavit of Teresa Udden ¶6[7]) In her performance evaluation for the period of

---

[6]

Although Ms. Kelly denies the defendant's statement of fact, she appears to do so only to the extent that she claims that CORT suffered no prejudice as a result of her extended lunch on May 30, 2005. (#36 ¶10; #37 ¶6)

[7]

While the plaintiff denies this statement, she does not dispute the supporting documentation other than to say that she disagreed with the warnings because CORT supervisors had not accepted her explanations as to why she was late on certain occasions. (#36 ¶¶13-16)

5

March 22, 2002 through September 22, 2003, Ms. Kelly's reliability to be at

work as scheduled was rated as very good, but her reliability to be at work at

schedule time was rated as fair, with the explanation that "Mary has had

excessive tardiness." (#31 ¶14, Exh. B, Depo. Exh. 19)  On May 27, 2004, the

plaintiff was issued a formal warning which stated, *inter alia*,

> Mary Kelly has had 7 occurrences of missing time from
> work this year.  She has missed 2.5 days in the past 30
> days to include 5/26/04 which has put a tremendous
> burden on the rest of the district when it comes to
> covering her responsibilities and more importantly the
> districts [sic] customer service....Mary Kelly is to report
> to work when scheduled without exception....All days
> off must be approved by her supervisor in advance to
> insure proper customer service....If Mary Kelly misses
> any more scheduled work days in 2004 she will be
> subject to further disciplinary action up to and
> including termination.

#31 ¶15, Exh. A ¶6 and Exh 1, Exh. B, Depo. Exh. 24.

In her Performance Evaluation for the review period of November 1, 2003

through November 1, 2004, Ms. Kelly's reliability to be at work as scheduled

was rated as good with the comment "Mary is responsible and is at work when

scheduled.  There was a period in May when Mary was having personal issues

and attendance was a concern.  Mary was calling in sick and leaving at lunch

time and not able to return.  Cort and I met with Mary and discussed this and

since then it has not been an issue." (Affidavit of Mary Kelly #36, Exh. A)

Similarly, her reliability to be at work at schedule time was rated as good with

the comment "Mary is not always in the office at 9 a.m., but calls me if she is

running late.  Mary needs to make more of an effort of being in the office and

ready to work by her scheduled time." (#36, Exh. A)  The plaintiff's overall

performance rating for 2003-2004 was very good. (#36, Exh. A)

Despite the May 2004 formal warning, Ms. Udden attests that the plaintiff

continued to arrive late for work and to take extended lunch breaks. (#31 ¶16,

Exh. A ¶7)  Ms. Kelly denies that she was late for work[8], and states that at times

she worked through her lunch break. (#36 ¶¶12-16; #37 ¶16)  On April 14,

2005, Ms. Udden and Mark Chiavelli, the Assistant District General Manager at

CORT's Norwood facility, met with the plaintiff to discuss her work schedule

with her. (#31 ¶¶8, 17, Exh. B, Depo. Exh. 30; #37 ¶¶8, 17[9])  During the course

of that meeting, "[i]t was outlined that [Ms. Kelly was] to clear all departures

---

[8]

The plaintiff admits that she "did arrive at [her] desk less than fifteen minutes after her scheduled start time on several occasions." (#36 ¶14)  She offered an explanation to her supervisor regarding her tardiness, i.e., she was on site (but not at her desk) discussing deliveries with warehouse personnel, but the excuse was not accepted and CORT issued her a warning. (#36 ¶¶14-15)  Ms. Kelly also admits to returning late from lunch one time in April, 2005 and, although she again offered an explanation, i.e., she had to drive her husband to the hospital, CORT issued her a formal warning. (#36 ¶16)

[9]

Again, although the plaintiff denies this statement of fact, she does so by stating that the supervisors did not accept her explanations, not that she denies the meeting occurred or that the formal warning issued.

from [her] normal schedule with Theresa"...and she was "to notify Donna [a CORT manager] of [her] comings and goings in particular with regard to lunch." (#31 ¶17, Exh. B, Depo. Exh. 30)

Less than two weeks later on April 27, 2005, Ms. Kelly took a two hour and fifteen minute lunch break without notifying anyone at CORT of her need for time over and above the normal hour lunch break. (#31 ¶18; #37 ¶18)  As a consequence, on May 3, 2005, CORT issued her a formal warning:

> Effective immediately it is expected that you adhere to your assigned work schedule (9am-6pm Monday - Friday with no more than 1 hour for lunch) at all times.   Deviations from this schedule are to be approved in advance by your manager, Teresa Udden. In her absence you are to seek out another manager (preferably Mark Chiavelli) and clear any scheduling changes with that manager.
> *****
> If performance or behaviors fail to meet expectations additional disciplinary action up to and including termination may result.

#31 ¶19, Exh. B, Depo. Exh. 30; #37 ¶19.

Later that same month on May 31, 2005, without seeking approval from any manager or otherwise notifying CORT in advance, the plaintiff took a three hour and fifteen minute lunch break. (#31 ¶20; #37 ¶20)

Upon returning to work on May 31st, Ms. Kelly met with Naomi

Schmuckler of the CORT human resources department to discuss her extended lunch break that day. (#31 ¶21; #37 ¶21[10])   According to her deposition testimony, the plaintiff told Ms. Schmuckler that she left work around 11:30 AM to go and pick her husband up at home in Plainville, Massachusetts because he needed the car to go to a court hearing in Quincy, Massachusetts; the plan was that he would drop her back off at work on the way to court.[11] (#31 ¶21, Exh. B at 209, 216)   However, upon leaving CORT, the plaintiff "was in so much pain with [her] back in which in [sic] caused [her] in the last hour to get a migraine that [she] went to the Emergency Room instead." (#31 ¶24, Exh. B at 216[12]; #36 ¶6)   When she arrived at the Emergency Room Ms. Kelly thought that she would be back at work within an hour, and, although it got later and

---

[10]

The plaintiff denies this statement of material fact "in that Ms. Kelly explained the reason for absence." (#37 ¶21)  She does not appear to deny either that the meeting took place or the content of her explanation for her lengthy lunch as related by Ms. Schmuckler and as stated in the plaintiff's deposition.

[11]

Ms. Kelly told Ms. Schmuckler that her husband had been bitten by a cat or raccoon and was getting shots for rabies which made him ill so he could not drive which was the reason she was bringing him the car. (#31 ¶22, Exh. B at 219-223,  226)  At his deposition Francis Kelly, the plaintiff's husband, denied having filed a lawsuit against a dentist or having a court appearance on May 31, 2005;  testified that he and his wife each had their own vehicles on May 31, 2005 and she was not coming to pick him up that day; and that, although he had been bitten by an animal and received rabies shots, the shots did not affect him at all and he drove himself each week to get the four shots. (#31 ¶23, Exh. D at 53-54, 57-63, 66-68, 71)

[12]

According to Ms. Schmuckler, the plaintiff told her that she went to the hospital for treatment of a migraine headache, but then produced documentation reflecting that she had been treated for back pain. (#31 ¶¶24-25, Exh. C ¶4)  Ms. Kelly denies that she went to the hospital for treatment for a migraine, but rather for her back pain. (#37 ¶¶24-25)

later, she could not use her cell phone to call the office because it had to be shut off in the hospital and there was no pay telephone for her to use in the area. (#31 ¶¶24, 26, Exh. B at 216-217; #36 ¶7)  Between 11:30 AM and 2:45 PM on May 31, 2005, Ms. Kelly never called the office to advise CORT of her whereabouts. (#31 ¶26, Exh. B at 213) She further testified that "[t]o not call [CORT] was wrong"..."I should have called them." (#31 ¶26, Exh. B at 235)

According to Ms. Schmuckler, she advised the plaintiff "that her story seemed unreliable given its inconsistencies and her prior attendance problems." (#31, Exh. C ¶4)  Ms. Kelly asked Ms. Schmuckler if the events of the day were going to be a problem or if she was going to be fired and Ms. Schmuckler responded "that it could potentially be a problem because [the plaintiff was] essentially MIA from 11:30 to 2:45." (#36, Exh. B at 218-219)

A Group Vice President of CORT, Richard Freeman, affirms that:

> [O]n June 1, 2005, I participated in a meeting with Mark Chiavelli (who was employed with CORT as an Assistant District General Manager at that time), Kendra Crocker (who is a CORT Assistant District General Manager), Adam Yawnick (who is CORT's District General Manager for the Boston District), and Naomi Schmuckler (who is a CORT Senior Human Resources Manager) during which we discussed whether Ms. Kelly's misconduct warranted the termination of her employment.  Our group decided that termination was necessary and proper given that

10

> Ms. Kelly was missing in action without authorization
> for such an extended period of time on May 31 and
> based on her unbelievable account of the absence and
> her history of unacceptable attendance and tardiness.
>
> In making the decision to discharge Ms. Kelly,
> our management team did not discuss or consider Ms.
> Kelly's alleged back condition.

#31 ¶¶27, 28, Exh. E ¶¶4, 5, Exh. C ¶¶5, 6; #37 ¶¶ 27, 28[13].

On June 1, 2005, Mark Chiavelli advised Ms. Kelly that she was terminated
from her employment at CORT. (#31 ¶29; #37 ¶29)

### III. The Summary Judgment Standard

The purpose of summary judgment "'is to pierce the boilerplate of the
pleadings and assay the parties' proof in order to determine whether trial is
actually required.'" *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y
Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1 Cir., 2005) (quoting *Wynne v.
Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1 Cir., 1992), *cert. denied*, 507 U.S.
1030 (1993)); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1 Cir., 1990).
The party moving for summary judgment bears the initial burden of asserting
the absence of a genuine issue of material fact and "support[ing] that assertion

---

[13]

The plaintiff admits these statements of fact as follows: "27. Admitted that Cort terminated Ms. Kelly
because she needed to be at the hospital to obtain medical are (sic). Ms. Kelly is without information as to
what they believed. She, however, notes that they had been told that she went to the hospital for treatment.
Kelly Aff., ¶9." and "28. Admitted based on Cort's allegations. Please see Response 27."

by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1 Cir., 2003) (citations omitted); *see also De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 115-16 (1 Cir., 2004). "'Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show, through materials of evidentiary quality, that such a dispute exists.'" *Cordero-Soto v. Island Finance, Inc.*, 418 F.3d 114, 119 (1 Cir., 2005) (quoting *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1 Cir., 2004)); *see also Mulvihill*, 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1 Cir., 2000)).

When considering whether to grant summary judgment, the Court must determine whether "...the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court looks to "the record on summary judgment in the light most favorable to the nonmovant." *Hoffman v. Applicators Sales and Service, Inc.*, 439 F.3d 9, 11 (1 Cir., 2006) (citing *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1 Cir., 2000)). All reasonable inferences will be drawn in the favor of the nonmoving party. *Poulis-Minott v. Smith*, 388 F.3d

354, 361 (1 Cir., 2004); *see also Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d

30, 34 (1 Cir., 2005), *cert. denied*, 547 U.S. 1143 (2006); *Santoni v. Potter*, 369

F.3d 594, 598 (1 Cir., 2004); *Mulvihill*, 335 F.3d at 19; *Podiatrist Ass'n, Inc. v.*

*La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6, 13 (1 Cir., 2003).

      Despite this "notoriously liberal" standard, *Mulvihill*, 335 F.3d at 19,

summary judgment cannot be construed as "a hollow threat." *Kearney v. Town*

*of Wareham*, 316 F.3d 18, 22 (1 Cir., 2002). A factual dispute which is neither

"genuine" nor "material" will not survive a motion for summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue is 'genuine'

for purposes of summary judgment if 'the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'" *Poulis-Minott*, 388 F.3d

at 362-63 (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1 Cir., 1993),

*cert. denied*, 511 U.S. 1126 (1994)); *Rojas-Ithier*, 394 F.3d at 42; *Calero-Cerezo*

*v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1 Cir., 2004). Mere speculations raised

by the nonmoving party that are unsubstantiated will not be sufficient to defeat

summary judgment. *Nieves-Luciano v. Hernandez-Torres*, 397 F.3d 1, 5 (1 Cir.,

2005).

      In weighing whether a factual dispute is "material," the Court must

examine the substantive law of the case because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *De La Vega*, 377 F.3d at 115; *Rojas-Ithier*, 394 F.3d at 42.

The focus at the summary judgment phase "should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact.'" *Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 535 (1 Cir., 2002)(quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430-31 (1 Cir., 2000)); *see also Nieves-Luciano*, 397 F.3d at 4; *Rojas-Ithier*, 394 F.3d at 42. The party objecting to summary judgment must set forth specific facts proving a genuine issue of material fact in order to "'deflect the swing of the summary judgment scythe.'" *Noviello v. City of Boston*, 398 F.3d 76, 84 (1 Cir., 2005) (quoting *Mulvihill*, 335 F.3d at 19). Where "the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation,'" summary judgment will be appropriate. *Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21 (1 Cir., 2006) (quoting *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1 Cir., 2003) (further internal citations

14

omitted).  Moreover, the party objecting to summary judgment may not rest

"merely on allegations or denials in its own pleading."  Fed. R. Civ. P. 56(e);

*Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 425 F.3d 67,

83 (1 Cir., 2005).  Instead, Rule 56(c):

> mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against
> a party who fails to make a showing sufficient to
> establish the existence of an element essential to that
> party's case, and on which that party will bear the
> burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV. Discussion

In her complaint, Ms. Kelly alleges three claims:  Count I, a violation of

Massachusetts General Laws chapter 151B for handicap discrimination[14]; Count

II, a claim for intentional infliction of emotional distress; and Count III, a claim

for negligent infliction of emotional distress.  The handicap discrimination claim

---

[14]

Massachusetts law requires a plaintiff in a chapter 151B discrimination case to exhaust her administrative remedies, i.e., file a claim with the Massachusetts Commission Against Discrimination within six months following the purported discriminatory act, prior to filing a complaint in court. *See* Mass. Gen. L. c. 151B §§5, 9. *See also, e.g., Reidy v. Travelers Insurance Co.*, 928 F. Supp. 98, 106-107 (D. Mass., 1996), *aff'd.*, 107 F.3d 1 (1 Cir., 1997), *cert. denied*, 522 U.S. 809 (1997); *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 584-586, 631 N.E.2d 555, 557-559 (1994). Ms. Kelly does not allege in her complaint that she ever filed an MCAD complaint and there is a dearth of evidence on the issue in the record.  However, a telephone inquiry by the clerk to the Massachusetts Commission Against Discrimination confirmed that an MCAD complaint was timely filed by Ms. Kelly against CORT Furniture, to wit, within six months after her termination.  In the absence of any protest by the defendant, it shall be assumed that the claim in the complaint at bar is the same as that raised in the administrative claim.

shall be addressed first.

It is alleged in the complaint that the plaintiff had a handicap, that "Cort indisputably terminated Mrs. Kelly only because of her back handicap of which Cort had been aware," and that such a termination violates Massachusetts General Laws chapter 151B. (#6 ¶¶18, 21, 22)  In relevant part, that statute provides:

> It shall be an unlawful practice:
>
> *****
>
> 16.  For any employer...to dismiss from employment...or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

Mass. Gen. L. c. 151B §4(16).

By definition, a "'handicapped person' means any person who has a handicap," Mass. Gen. L. C. 151B §1(19), while "'handicap' means (a) a physical or mental impairment which substantially limits one or more major life activities of a

person[15]; (b) a record of having such impairment; or (c) being regarded as having such impairment." Mass. Gen. L. c. 151B §1(17).   According to the MCAD guidelines[16],   the nature and severity of an impairment, its duration and its long-term impact are considered when determining whether it is substantially limiting.   *Guidelines: Employment Discrimination of (sic) the Basis of Handicap*, www.mass.gov/mcad/disability1a.html#2, II. Definitions A(6). The guidelines further provide that "[a]n impairment substantially limits an individual's ability to work if it prevents or significantly restricts the individual from performing a class of jobs or a broad range of jobs in various classes."[17] *Guidelines: Employment Discrimination of (sic) the Basis of Handicap*,

---

[15]
        The statute is seen as distinguishing between those individuals who have a physical or mental impairment and "'those whose impairment "substantially limits" a "major life" activity....[o]nly the latter are protected by the Massachusetts statute.'" *Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination*, 441 Mass. 632, 637, 808 N.E.2d 257, 262-263 (2004) quoting *Dahill v. Police Dep't of Boston*, 434 Mass. 233, 237, 748 N.E.2d 956 (2001); *School Committee of Norton v. Massachusetts Commission Against Discrimination*, 63 Mass. App. Ct. 839, 844 n.4, 830 N.E.2d 1090, 1096 n.4, *rev. denied,* 445 Mass 1103 (2005).


[16]
        The MCAD Guidelines "'are entitled to substantial deference.'" *School Committee of Norton*, 63 Mass. App. Ct. at 844, 830 N.E.2d at 1096 quoting *Dahill v. Police Department of Boston*, 434 Mass. 233, 239, 748 N.E.2d 956 (2001).


[17]
        The Massachusetts Supreme Judicial Court has explained that "the fact that an individual is unable to perform 'only a particular aspect' of a 'single, particular job' is not sufficient to satisfy the 'substantial limitation' requirement of our antidiscrimination statute." *Ocean Spray Cranberries, Inc.*, 441 Mass. at 639, 808 N.E.2d at 264 quoting *City of New Bedford v. Massachusetts Commission Against Discrimination*, 440 Mass. 450, 466, 799 N.E.2d 578 (2003) (footnote omitted).

www.mass.gov/mcad/disability1a.html#2, II. Definitions A(6).  Lastly, under

the statute "[t]he term 'major life activities' means functions, including, but not

limited to, caring for one's self, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning and working." Mass. Gen. L. c. 151B

§1(20).  *See Prescott v. Higgins*, 538 F.3d 32, 44 (1 Cir., 2008)("[Plaintiff] must

demonstrate that he is 'handicapped' within the meaning of chapter 151B by

satisfying a three-step analysis: we must determine (1) 'whether a plaintiff's

condition, actual or perceived, constitutes a mental or physical "impairment"';

(2) 'whether the life activity curtailed constitutes a "major" life activity as

defined in G.L. c. 151B, § 1(20), and its accompanying regulations'; (3)

'whether the impairment *substantially limited the major life activity*.'")(citation

omitted; emphasis in original).

The framework within which to analyze a handicap claim under

Massachusetts is familiar:

> In disparate treatment cases, there is a three-stage order of proof...adopted from the approach taken by the Federal courts based on an analogous statute. In the first stage, the burden is placed on the plaintiff to show by a preponderance of the evidence a prima facie case of discrimination....
>
> To establish the prima facie case of unlawful employment discrimination on the basis of handicap

18

pursuant to G.L. c. 151B, a plaintiff who has been terminated from employment must show that: (1) he suffers from a handicap; (2) he is a 'qualified handicapped person'; and (3) he was fired solely because of his handicap.[18]

Once a prima facie case is made, the burden shifts to the [the defendant] to offer a legitimate nondiscriminatory reason for its action. A plaintiff could still prevail by showing that the reason given by the employer is merely a pretext for discrimination.

*Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 821, 678 N.E.2d 853, 859 (1997)(citations omitted); *City of New Bedford v. Massachusetts Commission Against Discrimination*, 440 Mass. 450, 461, 799 N.E.2d 578, 587 (2003)("Claims of handicap discrimination...proceed under the well-settled three-stage order of proof."); *Chief Justice for Administration and Management of the Trial Court v. Massachusetts Commission Against Discrimination*, 439 Mass. 729, 732, 791 N.E.2d 316, 320 (2003).[19]

---

[18]

In a later case, *Dartt v. Browning-Ferris Industries, Inc.*, 427 Mass. 1, 7, 691 N.E.2d 526, 530-531 (1998), the SJC acknowledged that there had been some inconsistency in describing the plaintiff's burden at this stage, and then stated unequivocally that "[w]e now make clear that as part of his prima facie case, a plaintiff alleging a violation of G.L. c. 151B, §4(16), need not establish that he was terminated...'solely' because of his handicap." (footnote omitted). Rather, it is the plaintiff's burden to "prove by a preponderance of the credible evidence that the defendant's discriminatory animus contributed significantly to that action, that it was a material and important ingredient in causing it to happen.... That a defendant's discriminatory intent, motive or state of mind is 'the determinative cause' does not imply the discriminatory animus was the only cause of that action." *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 506 at n. 19, 751 N.E.2d 360, 371 at n. 19 (2001)(citations omitted); *see also Cariligia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 84 (1 Cir., 2004).

[19]

Relying on the case of *City of New Bedford v. Massachusetts Commission Against Discrimination*, 440 Mass. 450, 462, 799 N.E.2d 578, 588 (2003)(citations omitted), CORT argues that there is a fourth element to the prima facie case, to wit, that "the position [the plaintiff] had occupied remained open and the employer sought to fill it." *But see Cargill v. Harvard University*, 60 Mass. App. Ct. 585, 586, 804 N.E.2d 377, 379-380 (2004) and cases cited. Courts detailing the factors of the prima facie case differently can perhaps be explained by the fact that "'Massachusetts has adopted a flexible approach to this framework, acknowledging that 'the facts necessary to establish prima facie case of discrimination will vary depending on [the] situation.' *Beal v. Board of Selectmen of Hingham*, 419 Mass. 535, 544, 646 N.E.2d 131 (1995)." *LaBonte*, 424 Mass. at 821, 678 N.E.2d at 859 (citation omitted). In any event, the Court need not reach the

Thus, the place to begin is with the plaintiff's prima facie case.  I conclude that Ms. Kelly's claim fails for three separate and independent reasons, i.e., she has not produced evidence from which a tried of fact could establish that (1) she is "handicapped" as that term is used in the statute, (2) that she is a "qualified handicapped person" as that phrase is used in the statute, and (3) that CORT's reasons for terminating her were a pretext for handicap discrimination.[20]

First, to be successful on her claim that her back condition was a handicap consequent to its effect on her ability to work, Ms. Kelly  bears the burden of showing that her daily activity of working was substantially limited by her back problem. *See, e.g.*, *Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination*, 441 Mass. 632, 638-639, 808 N.E.2d 257, 264 (2004). In seeking summary judgment, CORT contends that the plaintiff has failed to carry her burden.  The defendant's argument has merit.

In support of her claim that she has a handicap, Ms. Kelly states that she had notified CORT in 2003 that she was experiencing back problems and had submitted supporting medical reports, one dated in 2003 and one dated in

---

issue of the fourth prong, if any, in the context of this case.

[20] The third reason would assume that Ms. Kelly made out a prima facie case of handicap discrimination.

2005, to her supervisor. (#36, Exh. B, C)  The 2005 MRI report, for instance, indicates "mild to moderate bilateral facet joint hypertrophy" at the L4-L5 level, "slight bulging" and "mild bilateral facetjoint hypertrophy" at L5-S1 level, and "minimal bulging" and "mild bilateral facet joint hypertrophy" at the L5-L4 level. (#36, Exh. C)  There is no opinion from a doctor as to how, if at all, these findings affect Ms. Kelly's ability to work.  Together with the discharge form from the Emergency Room dated May 31, 2005, these records constitute the entire medical documentation with respect to the plaintiff's "handicap."  Ms. Kelly was never restricted in her work by a doctor while she was employed at CORT.  She did undergo "back procedures on various dates" which involved her missing "work on various Fridays." (#36 ¶4)  CORT accommodated her by permitting her to take the Fridays off, she recuperated over the weekend and returned to work on the following Monday. (#36 ¶4)  There is no evidence in the record reflecting how many of these back procedures Ms. Kelly had, or that these procedures affected her ability to work at all apart from missing the "various Fridays."

Ms. Kelly testified that she requested help in lifting boxes during the annual clean-up which she received, that she was not able to lift or deliver

items such as a couch or a chair, and that she "could not sit for extended periods at work...[and] needed to stand for considerable periods." (#36 ¶36) The plaintiff does not state how, if at all, the need to stand impacted her job or her ability to work. At her deposition, Ms. Kelly agreed her back problems did not affect her ability to perform everyday activities such as walking, getting up and down stairs, sitting, standing up, answering and talking on the telephone, typing, and filing paperwork.

The First Circuit has quite recently had occasion to write,

> To meet his burden, [the plaintiff] must do more than submit evidence that he was diagnosed with an impairment. *See [City of New Bedford],* 440 Mass. 450, 799 N.E.2d at 589. 'Rather, those seeking [G.L. c. 151B] protection must offer evidence that "the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial."' *Id.* (quoting *Carroll v. Xerox Corp.,* 294 F.3d 231, 238 (1st Cir.2002)). [The plaintiff] has offered no such evidence, and he is, therefore, not handicapped within the meaning of chapter 151B. There is no information in the record that he has a permanent or long-term disability that substantially affects one or more of his major life activities. Even though 'working' is a major life activity under Massachusetts law, [the plaintiff] has not demonstrated that he was 'substantially limited' in

> his ability to work. His claims under Massachusetts
> state law fail.

*Prescott*, 538 F.3d at 44-45.

In the light most favorable to Ms. Kelly, no trier of fact could find that her back condition "substantially limited" her ability to do her job as that term is defined in Massachusetts law. Although there is evidence that Kelly has been diagnosed with a "back condition", she has not met her burden of producing evidence from which a trier of fact could find that she had a handicap within the meaning of the statute, to wit, "a permanent or long-term disability that substantially affect[ed]" and limited her ability to work. *Prescott*, 538 F.3d at 43-45; *see also Benoit v. Technical Manufacturing Corporation*, 331 F.3d 166, 175-176 (1 Cir., 2003); *Preble v. Transportation Displays, Inc.,* 2005 WL 2065327, *2 (D. Mass., Aug. 22, 2005); *Marlon v. Western New England College*, 2003 WL 22914304, *10 (D. Mass., Dec. 9, 2003), *aff'd,* 124 Fed. Appx. 15 (1 Cir., 2005); *Grindley v. Royal Indemnity Company*, 1996 WL 780557, *5-6 (D. Mass., Nov. 19, 1996). Because Ms. Kelly "...has no reasonable expectation of proving [this] essential element of her case," summary judgment should enter for the defendant on Count I. *Garrity v. United Airlines, Inc.,* 421 Mass. 55, 60, 653 N.E.2d 173, 176

(1995).

Second, the plaintiff also falters in producing evidence upon which a trier of fact could find that she was a "qualified handicapped person" which, under the MCAD Guidelines, means:

> A 'qualified handicapped person' is a handicapped person who can perform the essential functions of a job with or without reasonable accommodation. The law protects qualified handicapped persons. The law does not require an employer to hire, promote or retain a handicapped person who cannot perform the essential functions of the job. The 'essential functions' of the job are those functions which must necessarily be performed by an employee in order to accomplish the principal objectives of the job. Put another way, the 'essential functions' are those that are not incidental or tangential to the job in question.

*Guidelines: Employment Discrimination of (sic) the Basis of Handicap*, www.mass.gov/mcad/disability1a.html#2, II. Definitions B.; *see also* Mass. Gen L. c. 151B §1(16)("The term 'qualified handicapped person' means a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap.").

The undisputed facts show that Ms. Kelly was unable to perform  functions she admitted to be essential to her job as a Project Coordinator at CORT, those being having good attendance, reporting to work on time and adhering to a work schedule, and keeping co-workers and managers apprised of her work

schedule.[21]

CORT underscores the importance of being on time for work and complying with the work schedule in its Employee Handbook.  The plaintiff agreed that CORT's business could be hurt and its reputation damaged with its customers if she, a Project Coordinator, was not punctual at her job and did not routinely advise her managers of her whereabouts during the workday.  CORT "consistently discharges employees who...display a pattern of poor attendance and tardiness." (#31 ¶32, Exh. C ¶7)

The plaintiff's 2002-2003 performance evaluation rated her reliability to be at work at schedule time as fair due to her "excessive tardiness."  She received a formal warning on May 27, 2004, consequent to her inordinate absenteeism which "put a tremendous burden on the rest of the district when it comes to covering her responsibilities and more importantly the districts (sic) customer service."  In her 2003-2004 performance evaluation, although her reliability to be at work at scheduled time was rated as good, her manager nonetheless commented that "Mary needs to make more of an effort of being

---

[21]

For cases in which evidence of these types of failures were found to demonstrate that a person was not a "qualified handicapped person," *see Rodrigues v. Trafalgar House, Inc.,* 1998 WL 1184140 (Mass. Super., Sept. 18, 1998); *Picot v. New England Telephone & Telegraph Company,* 1994 WL 878936 (Mass. Super., Dec. 15, 1994).

in the office and ready to work by her scheduled time."

Following the May 2004 warning, although she offers explanations for her tardiness, Ms. Kelly does not deny that she was late for work and late returning from lunch on several occasions which prompted a meeting with her supervisors on April 14, 2005, to discuss her work schedule.   The upshot of that meeting was that Ms. Kelly was counseled that she was to notify her managers of any departures from her regular work schedule, including lunch breaks.   Thirteen days later the plaintiff took a two hour and fifteen minute lunch break without any prior notice to CORT management, which resulted in a second formal warning being issued to her on May 3, 2005.   She was admonished in that warning that she was to take only an hour for lunch and that she was to adhere to her work schedule at all times.   On May 31, 2005, without notifying her supervisor, Ms. Kelly took a three hour and fifteen minute lunch break.   On June 1, 2005, she was terminated.

The Supreme Judicial Court has written that

> a handicapped employee who engages in egregious misconduct, sufficiently inimical to the interests of his employer that it would result in the termination of a nonhandicapped employee, is not a qualified handicapped person within the meaning of G.L. c. 151B, and therefore is not entitled to the protection of

> that statute.  While it is appropriate for a jury to decide
> the nature and extent of an employee's misconduct,
> where those issues are in dispute, the judge correctly
> concluded that [the plaintiff] had no reasonable
> expectation of proving that he was a qualified
> handicapped person on the facts of this case viewed in
> their light most favorable to him.

*Mammone v. President and Fellows of Harvard College,* 446 Mass. 657, 679-680, 847 N.E.2d 276, 292 (2006)(footnote omitted); *see also Garrity,* 421 Mass. at 63, 653 N.E.2d at 178.

Here, too, the underlying facts are undisputed and, viewing the facts in the light most favorable to Ms. Kelly, she has submitted no evidence to show that she has a reasonable expectation of establishing that she was able to perform the essential functions of her job *vis-a-vis* absenteeism, timeliness and adherence to a work schedule.  Her pattern of flagrant misconduct, both over the long term and particularly within the last month and a half of her employment, could certainly be viewed as "inimical to the interests of" CORT.  With the plaintiff having failed to show that she is a "qualified handicapped person", CORT is entitled to summary judgment on Count I.

Third, assuming *arguendo* that Ms. Kelly established her prima facie case and a presumption of discrimination was established, "[t]his presumption may be rebutted in the second stage of the analysis if the employer can articulate 'a

legitimate, nondiscriminatory reason for its...decision' backed by 'credible evidence [showing] that the reason or reasons advanced were the real reasons.'" *Chief Justice for Admin. and Management of Trial Court*, 439 Mass. at 733, 791 N.E.2d at 320 (citations omitted).

CORT has articulated three legitimate, nondiscriminatory reasons why the plaintiff was fired:   1) that she was basically missing in action without authorization for more than three hours on May 31, 2005; 2) that she offered an inconsistent and unbelievable account to explain that extended absence; and 3) that she had a lengthy history of unacceptable absences and tardiness.  There is undisputed evidence in the record supporting these reasons.  Regarding the first reason, Ms. Kelly does not dispute that she took an extended lunch break on May 31, 2005 from 11:30 AM to 2:45 PM, she does not dispute that she failed to seek advance approval from her managers for this lengthy absence as mandated by the May 3, 2005 formal warning, she does not dispute that she did not call her managers to report her whereabouts while she was gone (although she may have called once she left the hospital and was returning to work), and she does not dispute that she was wrong in not calling into the office.

The second reason is based upon CORT's belief that the plaintiff's

explanation for her extended lunch on May 31, 2001 was inconsistent and unbelievable, which is supported by the affidavits of CORT's Senior Human Resources Manager and Group Vice President. (#37, Exh. C ¶¶4-5, Exh. E ¶4) Finally, with respect to the third reason given for terminating Ms. Kelly, the plaintiff does not dispute that as a Project Coordinator at CORT it was essential that she be at work regularly and in a timely fashion, that she keep in touch with her supervisor during the day and that she advise her managers concerning her whereabouts.  Ms. Kelly does not contest that her absences and tardiness were noted on her performance reviews, that she had received a formal warning about her attendance in May, 2004 and a second formal warning about failing to adhere to her work schedule in May, 2005.  Moreover, the plaintiff agrees that within weeks of that second warning, she took a three hour and fifteen minute lunch break without seeking prior approval from her manager or calling to advise her manager of the reason for her absence.  Lastly, CORT has proffered evidence that it "consistently discharges employees who, like Ms. Kelly, display a pattern of poor attendance and tardiness." (#31 ¶32, Exh. C ¶7)

Clearly CORT has articulated and supported legitimate, nondiscriminatory reasons for Ms. Kelly's termination.  Following the three-stage analysis, at this

juncture the burden returns to the plaintiff.  In the words of the SJC:

> If an employer can produce a nondiscriminatory reason
> for its decision with an adequate evidentiary backing,
> then, to prevail in the third stage of the analysis, the
> plaintiff must persuade the trier of fact by a
> preponderance of the evidence that discriminatory
> animus was the 'determinative cause' for the
> employer's decision. *Lipchitz v. Raytheon Co.,* 434 Mass.
> 493, 504, 751 N.E.2d 360 (2001). A fact finder's
> decision in the third stage may be based, either in
> whole or in part, on a determination that a legitimate
> reason for the employer's decision advanced in stage
> two was actually a pretext. See *id.* at 501, 751 N.E.2d
> 360; *Abramian v. President & Fellows of Harvard
> College,* [432 Mass. 107], at 117-118, 731 N.E.2d 1075
> [2000].

*Chief Justice for Admin. and Management of Trial Court,* 439 Mass. at 733, 791
N.E.2d at 320-321.

Ms. Kelly has advanced no argument or submitted any evidence to
suggest that the defendant's nondiscriminatory reasons were pretextual.
Indeed, the plaintiff does not specifically address in her opposition the issue of
pretext at all.  She does not contend that she was told that she was being
terminated because of her back, or that any CORT employee ever made any
discriminatory statements about her back problems.  All that is repeatedly stated
in a conclusory fashion is her perception that "Cort terminated her only because

her disability caused her to take a long lunch break to obtain emergency treatment as to her back disability." (#35 at 1, 7, 13, 14)  However there has been no evidence proffered to suggest that any discriminatory animus of CORT was the reason Ms. Kelly was fired.

While the plaintiff suggests that CORT's claims with respect to her tardiness are "unfounded" (#35 at 5), this position is based upon her own explanations for her tardiness.  She does not contest that she was, in fact, late on various occasions and that CORT believed she was tardy/absent as shown by the two formal warnings issued to her by the company before she was fired. *See  Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 7 (1 Cir., 2000).  Merely to state that the defendant "makes the far fetched contention that Ms. Kelly needed to be terminated because she had been late to work on prior occasions" (#35 at 4) is not "evidence that discriminatory animus was the 'determinative cause' for the employer's decision."

With Ms. Kelly having failed to carry her burden of proof at the third stage of analysis, CORT is entitled to the entry of summary judgment in its favor on Count I of the complaint.

The claims in Counts II and III may be dispatched swiftly for, as CORT argues in seeking summary judgment, those claims for intentional and negligent

31

infliction of emotional distress are not cognizable because they are preempted

by the Massachusetts Worker's Compensation Act, Mass. Gen. L. c. 152 §1 *et seq*.

The plaintiff appears to concede the futility of Counts II and III since she did not

address those claims or the defendant's arguments with respect to them in her

opposition.

Under Massachusetts law,

> Common law actions are barred by the exclusivity provision of the workers' compensation act where: 'the plaintiff is shown to be an employee; his condition is shown to be a "personal injury" within the meaning of the [workers'] compensation act; and the injury is shown to have arisen "out of and in the course of ... employment."' *Foley v. Polaroid Corp.,* 381 Mass. 545, 548-549, 413 N.E.2d 711 (1980) (*Foley I*), quoting G.L. c. 152, § 26 (1994 ed.).

*Green v. Wyman-Gordon Co.,* 422 Mass. 551, 558, 664 N.E.2d 808, 813 (1996).

According to the allegations of the complaint, Ms. Kelly contends that she was

an employee of CORT and that her injury, emotional distress, arose out of and

in the course of her employment, to wit, from the defendant's "outrageous" or

"negligent" behavior in terminating her employment "based on her visit to the

emergency room to receive treatment." (Complaint #6 ¶¶ 3,4 25, 26, 29, 30;

#31 ¶¶9, 20, 27; #37 ¶¶9, 20, 27)  In the employment context, such common

law claims as are alleged in this case are barred by Mass. Gen. L. c. 152 §24[22].

*See Green*, 422 Mass. at 558, 664 N.E.2d at 813 ("The defendant argues, however, that those common law claims not barred by c. 151B, notably the claims for intentional and negligent infliction of emotional distress, are barred by the exclusivity provision of the workers' compensation act, G.L. c. 152, §24 (1994 ed.). We agree.")(footnote omitted);   *Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 565, 644 N.E.2d 815, 818 (1996)("The judge's decision that the plaintiffs' claims for negligence, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress were barred by the exclusivity provision of the workers' compensation act was correct."); *Gibney v. Dykes*, 72 Mass. App. Ct. 1107, 889 N.E.2d 981 (Table), 2008 WL 2677143, *1 (Mass. App. Ct., July 10, 2008); *cf. Bourbeau v. City of Chicopee,* 445 F.

---

[22] This exclusivity provision of the Massachusetts Worker's Compensation Act provides, in relevant part:

§24. Waiver of right of action for injuries

An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right, or, if the contract of hire was made before the employer became an insured person or self-insurer, if the employee shall not have given the said notice within thirty days of the time said employer became an insured person or self-insurer.

Mass. Gen. L. c. 152 §24.

Supp.2d 106, 117-118 (D. Mass., 2006); *Foley v. The Proctor & Gamble Distributing Company*, 2003 WL 21696544, \*\*4-5 (D. Mass., July 21, 2003). Summary judgment should enter on Counts II and III in favor of the defendant.

## V. Recommendation

For all the reasons stated, I RECOMMEND that Defendant CORT Furniture Rental's Motion For Summary Judgment (#29) be ALLOWED and that final judgment enter for the defendant.

## VI.  Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States*

*v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ *Robert B. Collings*
ROBERT B. COLLINGS
United States Magistrate Judge

February 26, 2009.